

## DEVELOPMENT AND PUBLISHING AGREEMENT

This Agreement is entered into as of March 29 2018, by and between tinyBuild LLC., a Limited Liability Company, located at 3831, 152nd PL SE, Bothell, Washington 98012 ("Publisher"), NIVAL INTERNATIONAL LIMITED, a legal entity duly incorporated and acting under the laws of Cyprus, having registration number HE 354994, located at 14 Panayioti Tsagkari, 1st floor, 4047, Limassol, Cyprus ("Developer") and Savvas Petras, Street address: Steliou Kotiadi 7 3rd Floor, Country: Greece, Postal Code: 85100 ("Designer").

**WHEREAS**, Publisher, Developer and Designer wish to enter into a Publishing Agreement whereby Developer and Designer shall create and develop the software (video game) under the name "**Starcraft Mod (working title)**" (the "Product") and Publisher shall publish the Product on the terms and conditions set forth herein,

**Short summary of the deal, see referenced points for details:**
- 50/45/5 revenue share (50% to publisher, 45% to developer and 5% to Designer) on all platforms, based on net receipts. Details in Point 4 & 9.

**NOW, THEREFORE**, the parties have agreed as follows:

| | |
|---|---|
| **1.** | **DEVELOPMENT, DESIGNING AND PUBLISHING OF THE PRODUCT** |
| 1.1. | Developer and the Designer shall create and develop the Product mentioned in the Exhibit A and grant in full intellectual property rights ("IP Rights") on the Product to the Publisher. All IP Rights to the Product are the property of the Publisher. |
| 1.2. | Final release ("Gold Master") of the Product shall be delivered to the Publisher by June 1st 2019 (the "Gold Master Delivery Date"). |
| 1.3. | IP Rights to the objects used in the process of and for the Product development, that or considered to be arisen after entering the Agreement, shall be vested to the Publisher. |
| 1.4. | Despite Clause 1.1 Developer's IP Rights to the objects that have arisen before entering the Agreement, but used in the process of and for the Product development, fully remain in the possession of the Developer. |
| 1.5. | On the date of approval mentioned in Clause 5.3 hereof, the Developer shall grant to the Publisher non-exclusive and non-transferrable license to use IP Rights mentioned in Clause 1.4 hereof. Objects mentioned in this article shall be defined and listed in the written appendix to be issued on the approval date mentioned in Clause 5.3 hereof |

(Licensed objects title list).

**1.6.** Regarding the license granted hereunder, the Publisher may during the Term (as hereinafter defined) and throughout the world (the "Territory") produce, reproduce, perform, promote, advertise, export, import, rent, license, sublicense, translate, localize, manufacture, package, market, merchandise, distribute (through Steam, Mobile Platforms and any other relevant distribution),display, sell, lease and otherwise exploit the Product, including products without original narrative or interactive elements designed to support and/or promote the product using the names, renderings, dialog, sound effects or screen shots from the Product (including, without limitation, clothing, posters, novelties and strategy guides of every kind and nature whatsoever) (hereinafter referred to as "Ancillary Products") on the Platforms defined in Clause 4.2 hereof.

## 2. MARKETING

**2.1.** Publisher shall determine, in its sole discretion, the manner and method of marketing and distribution of the Product, including, but not limited to, marketing expenditures, advertising and promotion, packaging, channels of distribution and the price of the Product, provided however, that Publisher shall use commercially reasonable efforts to cause the Product to be released within three (3) months of approval for all platforms, and shall spend at least **$100,000** on promotion, including own resources. Neither party makes any guarantee of success with respect to revenue to be achieved or royalties to be earned from the Product.

## 3. COMPETING PRODUCTS

**3.1.** Developer and Designer shall not, directly or indirectly, distribute a product of the same genre (i.e., third-person urban conflict rts similar in theme, look and feel) as the Product for any party other than Publisher until the date of 6 months (six months) following the initial release of the Product (unless the Publisher, Developer or Designer has decided to not continue working on the Project or its expansions. This should be done in under 60 days since release). The parties acknowledge and agree that the foregoing restriction is of the essence of this Agreement and is necessary for the protection of Publisher's ongoing business.

## 4. DEVELOPMENT CONDITIONS

**4.1.** Developer and the Designer shall provide Publisher with design specifications of the Alpha Demo version of the Product, and all parties shall determine the full scope of development and its Design Specification based on success of the Alpha Demo.

**4.2.** Developer and Designer shall develop the Product for the below mentioned Platforms:
- Steam
- PC (DRM-Free)
- Other relevant platforms at the time of release based on mutual agreement. Additional ports shall fall under this agreement acting as the floor.

**4.3.** Publisher may port the game to
- Xbox One, PlayStation 4, Nintendo Switch, and other relevant platforms as permitted by the platform as well as what is technically possible.

4.4. Everything shall be developed in accordance with the approved Design Specifications as discussed, the development schedule annexed hereto as Exhibit A (the "Development Schedule") and the terms and conditions of this Agreement. Material changes to the Design Specifications shall be mutually agreed in writing by the parties.

## 5. DELIVERY

5.1. Developer and Designer shall deliver to Publisher on release date a copy of the fully functional Gold Master for the Product (in executable object code form):
- Dedicated Client part of Product in electronic format, Bug (as hereinafter defined) free
- Fully pre-setup servers and databases on infrastructure linked to Client part, working in pair
- Full assets to server infrastructure with logins and passwords and deploy documentation

5.2. Developer and Designer are obliged for in time uploading to Steamworks backend and implementation of required APIs across another platforms only in accordance with milestones as part of accounting feature or after release date as part of platform integration (not included in Gold Master). Timely delivery in accordance with the Development Schedule is of the essence of this Agreement. In the event Developer and Designer fails to deliver the Gold Master for the Product by Gold Master Delivery Date unless such delivery date is extended by mutual agreement of Publisher, Developer and Designer, Developer and Designer shall be deemed to be in material breach of this Agreement. For the avoidance of doubt, the Cure Period (as hereinafter defined) shall not apply to any termination by Publisher pursuant to this Section.

5.3. Approval. After delivery to Publisher by Developer and Designer of each deliverable pursuant to the milestones identified in the Development Schedule (collectively, the "Unapproved Deliverables"), Publisher will have thirty (30) calendar days to examine and test such Unapproved Deliverable to determine whether it conforms in all material respects to the approved design specifications and whether it is complete and free from material error (the "Acceptance Criteria"). On or before the thirtieth day after delivery, Publisher will notify Developer and Designer in writing of Publisher's acceptance or rejection of the Unapproved Deliverable based upon the Acceptance Criteria and, in case of any rejection, will provide Developer and Designer with a reasonably detailed list of deficiencies in the Unapproved Deliverable. In the event that Publisher fails to provide Developer and Designer with such written notification within thirty days of the date of delivery of an Unapproved Deliverable, Publisher shall be deemed to have accepted such Unapproved Deliverable. In the event of a rejection, Developer and Designer will use its good faith, best efforts to correct the deficiencies (including, without limitation, any game breaking bugs and deficiencies that affect game play and/or compatibility to the platforms agreed hereunder) and will re-submit such Unapproved Deliverable within 30 days, as corrected, as soon as reasonably practicable following Publisher's rejection. Publisher will either accept or reject the corrected Unapproved Deliverables based upon the Acceptance Criteria. This procedure will continue until Publisher either (i) accepts the Unapproved Deliverable or (ii) elects to terminate this Agreement for material breach after the Cure Period (as defined herein) pursuant to Section 14(b)(ii).

## 6. CREDITS

6.1. Developer and Designer shall submit on-screen credits for the Product to Publisher for Publisher's approval, which approval shall not be unreasonably withheld. Publisher shall accord credit to Developer and Designer as developer and game designer with reasonable prominence on all printed materials related to the product, including without limitation, on front of the package, in the manual and advertising materials which shall contain Developer's logo. Developer's website address shall be displayed on the back of the package. The Product, user manual and Ancillary Products may contain the following legal: (C) tinyBuild LLC 2018 or such other legal as may be provided by Developer, Designer or Publisher.

## 7. DEVELOPER SUPPORT

7.1. During the three months following the initial release of the Product, at Publisher's request, Developer and Designer shall provide reasonable telephone/e-mail/chat support to Publisher's designated employees in connection with the technical support of users of the Product.

## 8. ADVANCE & FINANCING

8.1. Publisher shall pay the funds to the Developer for the development in total amount of **600,000 USD** as a recoupable non-refundable development budget in advance basing on milestones schedule as set forth in Exhibit A.

8.2. Publisher shall pay the funds to the Designer for development in the total of **$56,000 USD** as a recoupable non-refundable development budget in advance installments of 4,000 USD a month.

8.3. In any case such payments shall not be recognized as credit, loan or advance payments from Publisher to Developer or Designer, and in any case Developer or Designer will be not obligated to refund such payments to Publisher.

8.4. Developer and Designer may stop any works under the Agreement in case any of the payments set up in Exhibit A will become outstanding until the execution of payment.

8.5. The total amount to be recouped equally before revenue splits is **756,000 USD** as set out in points 2 and 8, and Exhibit A.

## 9. ROYALTIES

9.1. Publisher shall accrue to Developer's account royalties at a rate of **forty five percent (45%)** and to Designer's account royalties at a rate of **five percent (5%)** on Steam, Mobile, and other open platforms of the net receipts derived worldwide by Publisher and its affiliates from the commercial exploitation (including without limitation sales of, rental of, and time charged services derived from) of the Product and Ancillary Products.

9.2. For console and other closed platforms (PS4, Xbox One, Nintendo Switch, Xbox, Playstation Platforms, Current Nintendo Platforms, etc) the Publisher shall accrue to Developer's account royalties at a rate of **forty five percent (45%)** and to Designer's account royalties at a rate of **five percent (5%)** of the net receipts for those platforms. The Publisher shall do the port without any additional withholdings if the Project compiles

to Xbox One or PlayStation 4 at 1920x1080 while running at a minimum of 30fps. Otherwise the porting process will be paid out of a separate pot, where the costs will be determined by the amount of work hours involved.

9.3. Net receipts means amounts actually received by Publisher, less returns, credits, freight, taxes mentioned in Clause 10 (c), marketing budget mentioned in Clause 2.1, development budget mentioned in Clause 8.1, and similar charges and manufacturing (physical manufacturing costs) expenses and royalties.

10. **ROYALTY PAYMENTS**

(a) Royalties earned hereunder will be accrued monthly and paid in United States dollars **(according to definition of net receipts)** within forty five (45) days following the last day of the month in accordance with Publisher's regular accounting practices. Royalties statements shall be sent to the Developer and Designer. Publisher shall have the right to establish reserves for returns and defective products in accordance with Publisher's business practices (not to exceed 10% of royalties owed to Developer and Designer). Unused reserves shall be liquidated during the fourth month following the moth the reserve was taken. Where possible Publisher shall grant Developer and Designer access to financial reports.

(b) Each royalty payment hereunder shall be accompanied by a statement in United States dollars, in accordance with Publisher's regular accounting practices. Each royalty statement shall contain information relating to the life to date activity of the Product including period of statement, units sold, cost of goods, gross royalty, reserves, earned royalties, territories, sublicensed and repackaged sales and Ancillary Product sales. Each statement shall become binding on both parties and Developer or Designer shall neither have nor make any claim against Publisher with respect to such statement, unless Developer or Designer objects in writing to the statement of the specific basis of such claim within one (1) year after the date Publisher renders such statement.

(c) Royalty payments shall be less whatever taxes the laws of the applicable jurisdiction require be withheld in connection with such royalties and subject to applicable local currency remittance laws or foreign exchange remittance regulations.

(d) Publisher agrees that Developer or Designer may, not more than once during any calendar year, but only once with respect to any statement rendered hereunder, audit its books and records for the purpose of determining the accuracy of Publisher's statements to Developer or Designer. If Developer or Designer wishes to perform any such audit, Developer or Designer will be required to notify Publisher in writing at least thirty (30) days before the date when Developer or Designer plans to begin it. All audits shall be made during regular business hours, and shall be conducted on Developer's or Designer's behalf by a certified independent public accountant. Each examination shall be made at Developer's or Designer's own expense at Publisher's regular place of business in Seattle where the books and records will be made available to Developer's or Designer's accountant. In the event that Developer or Designer establishes as a result of an audit conducted by Developer or Designer, that there is a discrepancy in the royalty payments due to Developer or Designer of ten percent (10%) or more for the period covered by the audit, then Publisher shall pay to Developer or Designer, upon settlement of the audit, Developer's or Designer's reasonable third-party legal and



auditor's fees and disbursements actually incurred in connection with such audit and interest at the rate of 10% per annum on underpaid accountings.

(e) If Developer or Designer claims that additional monies are payable to Developer or Designer, Publisher shall not be deemed to be in material breach of this Agreement unless (i) Publisher fails to produce appropriate books and records of manufacture and sales for audit, or (ii) such claim shall have been reduced to a final judgment by a court of competent jurisdiction and Publisher shall have failed to pay Developer or Designer the amount thereof within thirty (30) days after Publisher shall have received written notice of the entry of such judgment or (iii) Publisher agrees that there are royalties owing and does not pay the amount thereof within thirty (30) days.

## 11. CONFIDENTIAL INFORMATION

(a) Publisher, Developer and Designer recognize that, in connection with the performance of this Agreement, each of them may disclose to the other information about the disclosing party's business or activities, which such party considers proprietary and confidential. All of such proprietary and confidential information of each party (which shall include, without limitation, all business, financial and technical information of a party, identities of customers, clients or licensees, proprietary software code and any other information whether oral or written which is not generally known or available to the public) is hereinafter referred to as "Confidential Information."

(b) The party who receives any Confidential Information agrees to maintain the confidential status for such Confidential Information, not to use any such Confidential information for any purpose other than the purpose for which it was originally disclosed to the receiving party, and not to disclose any of such Confidential Information to any third party unless required by law or court order.

(c) The Personal information of the Designer is to remain anonymous unless explicitly allowed by Designer.

## 12. REPRESENTATIONS AND WARRANTIES

(a) **Ownership and Non-infringement.** Developer and Designer represents and warrants to Publisher that it has obtained all rights, licenses and authorizations necessary to enter into this agreement and grant the rights granted herein; each of Developer, Designer and Publisher represent and warrant that the execution and performance of this Agreement does not and will not violate or interfere with any other agreement to which it is a party, Developer and Designer represents and warrants that the source code and development tools for the Product is or will be original to Developer and Designer and/or exclusively owned by Developer or Designer and/or validly licensed by Developer and Designer at Developer's and Designer's expense for all uses to be made of them pursuant to this Agreement and that the source code and development tools are not nor will they be a violation of the rights of any other person or organization; and Developer and Designer represents and warrants that no part of the Product or the exercise of the rights granted hereunder violates or infringes upon any rights of any person or entity, including, but not limited to, copyrights, trademark rights, patent rights, trade secrets rights, or contractual, common law or statutory rights.

(b) **Authority.** Each of Publisher, Designer and Developer represents and warrants that it is



duly organized and in good standing under the laws of the jurisdiction of its incorporation or existence; that it has (and shall at all times remain possessed of) the full right, power and authority to enter into and perform this Agreement; that it is not presently the subject of a voluntary or involuntary petition in bankruptcy, does not presently contemplate filing any such voluntary petition, and is not aware of any intention on the part of any other person to file such an involuntary petition against it; and the person(s) executing this Agreement on its behalf has the actual authority to bind Developer and Designer to this Agreement.

(c) **Performance.** Each of Publisher, Designer and Developer represents and warrants that it is under no disability, restriction or prohibition, whether contractual or otherwise with respect to its rights to execute and perform this Agreement; that the agreement of any person who is not a party to this Agreement is not necessary or required for it to carry out its obligations hereunder, or for it to enjoy the benefits contemplated by this Agreement; that during the Term of this Agreement, it will not enter into any agreement or make any commitments which would interfere with the grant of rights hereunder or its performance of any of the terms and provisions hereto; and that it will not, nor will it, sell, assign, lease, license or in any other way dispose of or encumber the rights granted to Publisher hereunder.

(d) **Operation.** Developer and Designer represents and warrants to Publisher that the Gold Master for the Product will operate in accordance with the applicable design specifications and with commonly accepted standards for operation of such product, will be free from any game breaking Bugs, significant programming errors or anomalies, and will operate and run in a reasonable and efficient business manner as described in the user and system configuration documentation which fully explains the operation and design of the Product.

13. **INDEMNITY**

(a) In the case of a claim by a third party regarding the Product, Publisher shall give Developer and Designer prompt written notice of any such claim. Publisher, Designer and Developer, with their respective attorneys, shall conduct the defense or settlement thereof. Publisher shall give Developer and Designer reasonable progress reports and Developer and Designer shall give Publisher reasonable assistance in defending or settling any such claim.

(b) In the event that, through the breach of any of Developer's or Designer's representations and warranties or the failure of Developer or Designer to perform any of its obligations herein, distribution of the Product is or is reasonably likely to be adjudged infringing or otherwise unlawful or violate of any right of any third party ("Infringing Product"), Developer and Designer shall, at its sole cost and expense, either (i) promptly modify the Product so that Publisher's distribution as permitted hereunder ceases to be infringing or wrongful, or (ii) promptly procure for Publisher the right to continue distributing the Product. In the case of an Infringing Product (a) Developer and Designer shall promptly reimburse Publisher for all costs incurred in replacing copies of the Product or for all refunds given, as well as all reasonable costs of removing all infringing copies of the Product from the channels of distribution; (b) Publisher shall be entitled to offset any royalty or other payments due to Developer and Designer under this Agreement (or any

other agreement) against any sums owed by Developer and Designer to Publisher under clause (a); and (c) following the commencement of any litigation covered by this Section in which Publisher is named as a defendant, Publisher shall be entitled to withhold royalty payments and all other sums payable to Developer and Designer hereunder pending the outcome of such litigation.

(c) Publisher does hereby indemnify, save and hold harmless Developer and Designer and Developer's and Designer's subsidiaries, affiliates, licensees, assigns, officers and employees from any and all loss and damage (including, without limitation, fees and disbursements of counsel incurred by Developer and Designer in any action or proceeding between Publisher, Designer and Developer or between Developer/Designer and any third party or otherwise) arising out of or in connection with any claim by any third party or any breach of, or act by Publisher which is inconsistent with, any of the warranties, representations or agreements made by Publisher in this Agreement, and agrees to reimburse Developer and Designer on demand for any payment made or loss suffered with respect to any claim or act to which the foregoing indemnity applies.

## 14. TERM AND TERMINATION

(a) **Term.** This Agreement shall become effective on the date set forth above and shall continue until the fifth anniversary of the date of this agreement or the date terminated as set forth in this Agreement. After fifth anniversary, it will be automatically renewed for 5 more years.

(b) **Breach.** (i) In the event of a material breach of this Agreement by Developer or Designer, Publisher shall have the right to suspend Publisher's obligations to make payments to Developer and Designer and/or offset any royalties or other payments due to Developer and Designer under this Agreement against any sums owed by Developer and Designer to Publisher under this Agreement until Developer and Designer has cured such breach. If such breach is not cured within thirty (30) days of written notice (the "Cure Period") Publisher shall have the right to terminate this Agreement. Any conflict or breach shall be solved in good faith from both parties. (ii) In the event of a material breach of this Agreement by Publisher, Developer shall have the right to stop works on Product until Publisher has cured such breach. If such breach is not cured within thirty (30) days of written notice (the "Cure Period") Developer shall have the right to terminate this Agreement. Any conflict or breach shall be solved in good faith from both parties. In any of such cases (i) or (ii) Developer and Designer will have rights on royalties proportionally of works accepted for final Product taking into account royalty split p.9.2.

(c) **Delivery.** In the event that Developer and Designer fails to deliver the Product by the Gold Master Delivery Date, Publisher may make other arrangements, including but not limited to engaging third party consultants, to develop the Product. All costs associated shall be covered by the Publisher, unless it exceeds $20,000. In that case the parties shall negotiate how to proceed. Upon notice by Publisher of its intention to develop the Product **in accordance with rules of this Agreement**, Developer and Designer shall deliver to Publisher all materials reasonably requested or required by Publisher to do so, including, but not limited to, the source code and the development tools to be used solely in connection with exploiting the Product, subject to Publisher's continuing obligation to account for royalties. In such a case Developer and Designer will have

rights on royalties proportionally of works accepted for final Products taking into account royalty split p.9.2.

(d) **Developer Safeguard.** Publisher may only take control of Development of the Product before the submission of Beta Milestone, assuming Developer has stopped developing the Product, based on Exhibit A, except events with outstanding payments as it is mentioned in Clause 8.4. If Developer continues to develop the Product past the Beta Milestone, all royalty rights will remain with Developer and Designer as stated throughout this agreement.

(e) **Events on Termination.** After the Product has been released by Publisher and the advance has been paid, notwithstanding termination of this Agreement for any reason whatsoever, Publisher shall have the exclusive continuing right to market and distribute the Product and **Developer and Designer shall have undisputable right to receive royalties from sales and the Publisher shall be obliged to pay them to the Developer in accordance with the payment conditions hereof.**

15. **GENERAL PROVISIONS**

(a) Assignment. Neither party shall have the right to assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party which consent shall not be unreasonably withheld.

(b) Notices. All notices and other items from one party to the other hereunder will, unless herein indicated to the contrary, be sent by facsimile with a copy by mail addressed as follows:
To Developer: At Developer's address as set forth on the first page hereof, directed to
**NIVAL INTERNATIONAL LIMITED**
14 Panayioti Tsagkari, 1st floor, 4047, Limassol, Cyprus

To Designer: At Designer's address as set forth on the first page hereof, directed to Savvas Petras, Street address: Steliou Kotiadi 7 3rd Floor, Country: Greece, Postal Code: 85100

To Publisher: At Publisher's address as set forth on the first page hereof, directed to the attention of Luke Burtis at 3831, 152nd PL SE, Bothell, Washington 98012

Any notice shall be sent by by facsimile, to the facsimile number of the party to be served and shall be deemed complete at the time of receipt of the written confirmation at the end of the facsimile in question.

(c) Governing Law. This Agreement shall be construed under the internal laws of the State of Washington applicable to agreements to be performed wholly therein, and both parties agree that Washington courts and the American Arbitration Association in Washington shall have jurisdiction over this Agreement and any controversies arising out of this Agreement shall be brought by the parties to the Supreme Court of the State of Washington, County of King, or to the United States District Court for the Southern District of Seattle, or to the appropriate arbitration tribunal in Seattle City and they hereby grant exclusive jurisdiction to such court(s) and to any appellate courts having



jurisdiction over appeals from such court(s).

(d) Survival. The representations, warranties, indemnification, termination and confidentiality obligations set forth in this Agreement shall survive the termination of this Agreement by either party for any reason.

(e) Amendments. No supplement, modification, amendment, waiver, termination or discharge of this Agreement shall be binding, unless executed in writing by a duly authorized representative of each party to this Agreement.

(f) Entire Agreement. This Agreement constitutes the complete and entire agreement of the parties and supersedes all previous communications, oral or written, and all other communications between them relating to the subject matter hereof.

(g) Force Majeure. No party shall be responsible for delays or failure of performance resulting from acts beyond the reasonable control of such party, including, acts of God, war, power failures, floods, earthquakes and other natural disasters.

(h) Counterparts. This Agreement may be executed in one or more counterparts, each of which when taken together, shall be deemed to constitute one and the same instrument.

(i) Facsimile Signatures. Facsimile signatures on this Agreement shall be deemed originals for all purposes.

(j) Severability. If any provision of this Agreement shall be adjudicated to be invalid or unenforceable, it shall be construed by limiting and reducing it so as to be enforceable or eliminating it, without invalidating the remaining provisions of this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date specified below.

**AGREED TO AND ACCEPTED:**

| tinyBuild LLC | NIVAL INTERNATIONAL LIMITED | DESIGNER |
|---|---|---|
| By: Aleksandrs Niciporciks | By: Vlads Puckorjus | By: Savvas Petras |
| Title: CEO | Title: Director | Title: |
| Date: March 29, 2018 | Date: March 29, 2018 | Date: March 29, 2018 |

Exhibit A

Development/Funding Milestones

| Milestone | Payment | Funding | Content |
|---|---|---|---|

| | date/Delivery Date | | |
|---|---|---|---|
| Pre-production | April 1st 2018/ July 1st 2018 | 250.000 USD | Developers infrastructure, server side infrastructure, pack of concept, design, art and tech documents, feature list, assets list, fake demo |
| Alpha stage | July 1st 2018/ November 1st 2018 | 150.000 USD | Session part of game with full game mechanics, draft balance, back and part of session, 60% art assets |
| Beta stage | November 1st 2018/ April 1st 2019 | 100.000 USD | Lobby part of game, matchmaking system, meta gameplay mechanics, accounting, full assets. Game is ready for public beta-testing. |
| Gold master | April 1st 2019/ June 1st 2019 | 100.000 USD | Polishing, statistics, operation tools, monitoring, optimization, Bug fixing |